**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| THE CANNON CORPORATION <br> 2170 Whitehaven Road <br> Grand Island, NY 14072, <br><br> CANNON DESIGN, INC. <br> 2170 Whitehaven Road <br> Grand Island, NY 14072, <br><br> CANNON DESIGN <br> 225 N. Michigan Avenue <br> Chicago, IL 60601-7757, <br><br> CANNON DESIGN ARCHITECTS, PC <br> 2170 Whitehaven Road <br> Grand Island, NY 14072, <br><br> CANNON DESIGN ARCHITECTURE <br>     AND ENGINEERING, PC <br> 2170 Whitehaven Road <br> Grand Island, NY 14072, <br><br> CANNON BOSTON, INC. <br> 100 Cambridge Street, Suite 1400 <br> Boston, MA 02114-2545, <br><br> CANNON DESIGN, INC. <br> 1100 Clark Avenue <br> Saint Louis, MO 63102-1110, <br><br> CANNON DESIGN N.J. ARCHITECTURAL <br>     AND RELATED SERVICES, <br> 2170 Whitehaven Road <br> Grand Island, NY 14072, <br><br> OWP/P CANNON DESIGN, INC. <br> 225 N. Michigan Avenue, Suite 1100 <br> Chicago, IL 60601-7683, <br><br> CANNON PARKIN INC. <br> 1901 Avenue of the Stars, Suite 175 <br> Los Angeles, CA 90067-6000, | Case No. _____ |

and                                          )
                                             )
CANNON WASHINGTON INC.                       )
250 W. Pratt Street, Suite 2100              )
Baltimore, MD 21201-0000,                    )
                                             )
                         Plaintiffs,         )
                                             )
            v.                               )
                                             )
UNITED STATES DEPARTMENT                     )
    OF VETERANS AFFAIRS                       )
810 Vermont Avenue, NW                        )
Washington, DC 20420,                         )
                                             )
                         Defendant.          )
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### NATURE OF THE ACTION

1.     The above-captioned Plaintiffs (collectively "Cannon") bring this action against

the United States Department of Veterans Affairs ("VA") under the Administrative Procedure

Act ("APA"), 5 U.S.C. §§ 701-706, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

Cannon seeks declaratory and injunctive relief against the VA for the unlawful suspension of

Cannon from receiving federal contracts, subcontracts, and non-procurement awards.

2.     Cannon is a privately held architecture and engineering firm headquartered just

outside of Buffalo, New York.  Started as a one-man operation nearly 100 years ago (in 1916), it

currently employs approximately 900 professionals and staff and is 100% employee-owned.

Cannon performs a substantial amount of work for the federal government, as well as state, local

and foreign governments.  Historically, close to 8% of its revenue is derived from federal

contracts, a significant portion of which come from the VA.  Not only does Cannon rely on

federal work, but Cannon's status with the federal government is crucial to maintaining the large

volume of business Cannon does for other public-sector entities.   In combination with state, local, and foreign-government contracts, Cannon's total government-contract work makes up almost 50% of its business.   Remaining in good standing with the United States Government is critical to maintaining qualifications for most other government and commercial contracting work.

3.       On May 19, 2015, the VA – without any reasonable basis in law or fact, and through a process tainted by multiple conflicts of interest – suspended Cannon, rendering Cannon ineligible for any federal contract, grant or other forms of financial assistance.   The effects were immediate and devastating, and have continued to compound daily.   In the now three-plus months since the suspension, Cannon has already lost approximately $5 million in net fees as a result of the suspension.

4.       The harm is not limited to lost federal business.   Because most state, local and foreign governments, as well as Cannon's private-sector customers, base award decisions at least in part on a company's status with the federal government, Cannon's entire business has been affected, and Cannon is presently in jeopardy of losing additional business permanently if the suspension is not lifted and declared void *an initio*.

5.       While the prospective financial harm that Cannon fears and anticipates will be caused by the suspension is difficult to quantify with absolute precision, Cannon reasonably estimates that it is at risk of losing over $79 million in net fees if the suspension continues because Cannon's clients have indicted an unwillingness to continue to do business with a company that is suspended by the federal government.

6.       As result of the suspension, Cannon also estimates it is at risk of being disqualified for approximately $60 million in net fees on potential contracts that Cannon has

pursued.  Similarly, Cannon has lost approximately $3 million in net fees for work from existing customers, where, based on representations from the customer, Cannon expects to have received additional work but was advised by the client that because Cannon is suspended, Cannon is unable to continue to pursue the additional work.

7.      Since the suspension, Cannon has forgone pursuing approximately $24 million in potential net fees on contracts it would have otherwise pursued, but for the suspension. Although Cannon would not expect to win all of these opportunities, but for the suspension, Cannon would have pursued and expected to have been awarded some portion of these opportunities.

8.      Since the VA's May 19, 2015 suspension, Cannon has made repeated pleas to the VA requesting that the VA examine the underlying facts related to the events that the VA contends justified the suspension.  To that end, Cannon has demonstrated to the VA through document submissions and telephonic conference calls how the relevant facts – when viewed in a fair and objective light, pursuant to the VA's own regulations and the Federal Acquisition Regulation ("FAR"), and without bias or inherent conflicts of interest – do not justify the May 19 suspension, and that the suspension should not only be lifted but declared null and void.  To date, the VA has refused to lift the suspension.

9.      Nearly half of Cannon's business relies on public-sector work.  Not only is the suspension causing Cannon to lose business, but it is causing severe harm to Cannon's reputation.  If the suspension continues, Cannon may be so damaged it is forced out of business. Already, Cannon's business – including its employees and retirees who depend on Cannon and stand to lose not only their income if the company goes out of business but also substantial retirement benefits, *inter alia* – has suffered injury from which it may never fully recover.

10.     Because both the May 19 suspension and the VA's subsequent refusal to lift that suspension constitute abuse of discretion and arbitrary and capricious final agency action, and are not otherwise in accordance with law, Cannon has been left with no other choice than to file this complaint for relief.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this civil action under 28 U.S.C. § 1331 because the action arises under federal law, namely the APA, 5 U.S.C. §§ 701-706, and the Declaratory Judgment Act, 28 U.S.C. § 2201.  Cannon has no other adequate remedy in law for challenging the final agency action that is the subject of this Complaint.

12.     Through the APA, the United States has waived sovereign immunity from this lawsuit.

13.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because the Defendant resides in this judicial district and the actions that are the subject of this Complaint were taken, at least in material part, in this district.

## PARTIES

14.     The Cannon Corporation is a privately held, 100% employee-owned, architecture and engineering firm, headquartered in Grand Island, New York, just outside of Buffalo.  It currently employs approximately 900 professionals and staff at its headquarters and throughout its offices in Washington, D.C., Baltimore, Boston, Buffalo, Chicago, Los Angeles, Montreal, New York City, Phoenix, Pittsburg, San Francisco, St. Louis, Toronto, Vancouver, Mumbai, and Abu Dhabi.

15.     Plaintiffs Cannon Design, Inc., Cannon Design, Cannon Boston, Inc., Cannon Design, Inc., Cannon Design N.J. Architectural And Related Services, OWP/P Cannon Design, Inc., Cannon Parkin Inc., and Cannon Washington Inc., are subsidiaries of The Cannon

Corporation with a principal place of business at the location indicated in the caption above. Plaintiffs Cannon Design Architects, PC, and Cannon Design Architecture and Engineering, PC, are affiliates of Plaintiff The Cannon Corporation with a principal place of business at the location indicated in the caption above.

16.     The VA is a Department of the United States Government.  Its headquarters are in Washington, D.C.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

**Procurement Framework**

17.     This lawsuit arises in the area of federal government contracting, and stems from the VA's suspension of Cannon from all federal contracting and non-procurement awards.  An overview of the procurement regulations and framework is therefore important.

18.     Suspension decisions are governed by Federal Acquisition Regulation ("FAR") § 9.407.[1]  Contractors that are suspended are excluded from receiving, among other things, contracts, certain subcontracts, grants, and other forms of financial assistance from the federal government.  *See* FAR 9.405.  When a contractor is suspended, the suspension is publicly noted online in the System for Award Management.  *See* FAR 9.404.  Suspensions are temporary exclusions but may lead to debarments, which result in an exclusion for specific period of time.

19.     As a general matter, suspension is a serious action that may only be imposed on the basis of adequate evidence, pending the completion of investigation or legal proceedings, when it has been determined that "immediate action is necessary to protect the government's interest."  FAR 9.407-1(b)(1).  If a contractor is "presently responsible" (*i.e.*, does not pose an immediate threat to the government's interests), then suspension is not appropriate.

---

[1] The FAR is incorporated into the Code of Federal Regulations at Title 48.

20.     The existence of a cause for suspension does not necessarily require that the contractor be suspended.  FAR 9.407-1(b)(2).  Rather, the regulations specifically encourage a suspending official to consider the seriousness of the contractor's acts or omissions, as well as potential remedial measures taken by the contractor and other mitigating factors.

21.     The narrow grounds for suspension reflect the understanding that precluding a contractor from receiving federal contracts and grants, or serving as a subcontractor or sub-recipient of federal funds, can cause devastating consequences.

22.     Because of the serious nature of debarment and suspension, these sanctions may only be imposed for the government's protection, and may not be imposed for the purpose of punishment.  FAR 9.402.

23.     It has been noted by certain government authorities, including the U.S. Government Accountability Office ("GAO"), that the role of an agency's suspension and debarment office should be dedicated to that task, and its personnel not assigned to competing responsibilities, such as procurement.  In a recent publication, the GAO recommended that full-time, dedicated suspension and debarment personnel are instrumental to a program's success, and further that agencies should assign dedicated staff resources to improve their programs.[2] Others have remarked that an important benefit of maintaining separation between the office that oversees the procurement program (*i.e.*, the "acquisition" side that reviews bids and awards contracts, *inter alia*) on the one hand and the office that reviews and considers cases recommended for suspension or debarment on the other is that it instills a sense of independence

---

[2] U.S. Government Accountability Office Report to Congressional Committees, *Suspension and Debarment: Some Agency Programs Need Greater Attention, and Governmentwide Oversight Could be Improved*, Publication No. GAO-11-739 (Aug. 2011) at 12-14, 23, available at http://www.gao.gov/assets/590/585277.pdf.

and integrity by keeping the acquisition decision-making separate from suspension and debarment decision-making.[3]   For example, a former United States Air Force Suspension and Debarring Official ("SDO") testified before Congress on multiple occasions about the importance of agencies going beyond the GAO recommendation of maintaining dedicated personnel for the distinct functions; agencies should structure their programs to avoid the conflicts of interest that arise when SDOs are not kept separate from agency acquisition functions.[4]   Congress has also recognized the need to preserve SDO impartiality.   In the 2013 National Defense Authorization Act, Congress required at least some agencies to ensure the SDO position is independent from acquisition functions.[5]

24.     Congress further required those agencies to ensure that the SDO is also independent from the agency Office of Inspector General ("OIG").[6]

---

[3] *Weeding Out Bad Contractors: Does The Government Have The Right Tools: Hearing before the Senate Comm. on Homeland Security and Governmental Affairs,* 112th Cong. (2011) (Prepared Statement of Steven A. Shaw, Deputy General Counsel (Contractor Responsibility), Department of the Air Force) (listing independence as the first theme in a vibrant suspension and debarment apparatus) [hereinafter *Weeding Out Bad Contractors Hearing*], available at http://www.gpo.gov/fdsys/pkg/CHRG-112shrg72557/pdf/CHRG-112shrg72557.pdf.

[4] *Protecting Taxpayer Dollars: Are Federal Agencies Making Full Use of Suspension and Debarment Sanctions?:Hearing before the House Comm. on Oversight and Government Reform, Subcommittee on Technology, Information Policy, Intergovernmental Relations and Procurement Reform,* 112th Cong. (2011) (Prepared Statement of Steven A. Shaw, Deputy General Counsel (Contractor Responsibility), Department of the Air Force) ("The Air Force's suspension and debarment program is effective because it has a full time, senior career Suspending and Debarring Official  who is supported by a dedicated staff, is separate from the acquisition chain, and is empowered to do the right thing to protect the Government . . . .  I have never once felt political or acquisition-driven pressure to avoid taking action or to take action."), available at http://www.safgc.hq.af.mil/shared/media/document/AFD-111006-094.pdf.

[5] National Defense Authorization Act for 2013, 112 Pub. L. 239, 126 Stat. 1632 at Sec. 861(a).

[6] *Id.*

25.     The VA does not maintain separation between its acquisition and suspension and debarment offices.  To the contrary, Jan R. Frye, its Senior Procurement Executive ("SPE"), who is "responsible for the management direction of the VA acquisition system," *see* 48 C.F.R. §§ 801.304, 802.101, is also its SDO.  In general, an SPE is "responsible for management direction of the acquisition system of the executive agency, including implementation of the unique acquisition policies, regulations, and standards" of the agency.  FAR 2.101.  The SPE (Mr. Frye) is also the Deputy Assistant Secretary for Acquisitions and Material Management." 48 C.F.R. § 802.101.  The VA's power to execute, award, and administer contracts, including those for architect-engineer services, is delegated to Mr. Frye as the SPE.  48 C.F.R. § 801.602. Only through the delegation of his authority can a contracting officer execute, award, administer and terminate contracts.  *Id.*   Mr. Frye, as SPE, is ultimately responsible for any contract awarded by the VA.  As described on the VA website, "[a]s the Deputy Assistant Secretary of one of the largest acquisition and logistics programs in the Federal government, Mr. Frye manages and oversees the development and implementation of policies and procedures for department-wide acquisition and logistics programs supporting all VA facilities."[7]   At the same time, as the VA's SDO, Mr. Frye oversees all recommendations as to whether to suspend or debar a contractor, and ultimately decides whether to suspend or debar a VA contractor.  Mr. Frye's dual roles create an inherent conflict of interest because he is responsible for suspending and debarring contractors for work he, as the SPE, awarded.   His impartiality is thus compromised – it is unrealistic to think that he could impartially evaluate whether a company

---

[7] VA Office of Acquisition and Logistics biography of Deputy Assistant Secretary Jan R. Frye, http://www.va.gov/oal/about/bioFrye.asp

should be suspended without being influenced by his knowledge and role as the SPE who awarded contracts to the contractor in the first place.

26.     The VA's SDO is subject to a second, systemic conflict because the VA OIG has the power to influence the SDO's decision.  A representative of the VA OIG serves on the VA Debarment and Suspension Committee ("D&S Committee"), despite the fact that the primary function of the OIG is to investigate alleged misconduct within the VA, including – importantly – allegations of misconduct related to VA procurements.  While the role of the VA OIG is to determine whether misconduct occurred, the role of the SDO is to determine whether alleged misconduct warrants exclusion from federal contracting.  Even if misconduct constitutes grounds for suspension, the regulations are clear that the SDO is not required to suspend a contractor and that the SDO may consider other elements of the contractor's present responsibility when determining whether suspension is absolutely necessary to protect the government's interests.  However, because of the OIG's principal role of investigating misconduct, its involvement in the suspension decisionmaking process creates an inherent conflict of interest – it would be impossible for the OIG to view a contractor under investigation impartially when rendering a recommendation on whether the SDO should suspend.

27.     The D&S Committee plays an important role in the suspension and debarment process.  The committee is composed of:

- The Director, Acquisition Resources Service (chair);

- Representatives of the VA Office of Management;

- Representatives of the OIG; and

- Representatives of the program office to which the particular debarment or suspension case relates.

48 C.F.R. § 802.101.

28.     The D&S plays an important role.  Although the SDO (at all relevant times here Mr. Frye) makes the final determination on whether to suspend or debar a contractor, when the VA receives a recommendation that a contractor be suspended or debarred, the matter is referred to the D&S Committee for review.  *See* 48 C.F.R. § 809.407-3(a).  The D&S Committee then, among other things, investigates the matter and interacts with the contractor facing potential suspension or debarment as necessary to determine if it believes there is cause for suspension in accordance with FAR 9.407-2 and presents facts to the SDO.  *See* 48 C.F.R. § 809.407-3(b).  The SDO, in turn, relies heavily on the D&S Committee's reports and recommendations and makes the ultimate decision to suspend or debar the contractor.  If the SDO decides to suspend, the D&S Committee prepares a notice of suspension in accordance with the FAR.  *See* 48 C.F.R. § 809.407-3(c).

29.     A suspension has immediate legal effect.  Following notice of suspension, the suspended contractor may make written submissions in opposition to the suspension and request a hearing with the D&S Committee.  *See* 48 C.F.R. § 809.407-3(d).  Following the hearing (if one is held), the D&S Committee prepares a report of the hearing for the SDO.

**Company Background**

30.     Cannon was founded in 1916 by Will Cannon Sr. in Niagara Falls, New York. From its beginning as a one-man architecture firm, today Cannon employs more than 900 professionals and staff and has become a truly world-class architecture and engineering firm. But while Cannon has grown over the years and opened offices across the United States and in Canada, India, and the Middle East, it is still privately held and 100% employee-owned, and remains true to its western New York roots with headquarters in Grand Island, just outside Buffalo.

31.     Through 1945, Will Cannon built a strong reputation for excellence with a portfolio of notable design projects.  In 1945, his sons Will Jr. and Don joined the company.  From that point to the early 1980s, the Cannons built their family business into an architecture and engineering firm that was the envy of others, with a growing national vision and presence.

32.     By 1975, Cannon had grown to 120 employees, and by 1985 the company had nearly tripled in size to 350 employees.  The headcount reached 500 employees in 2000, and is at about 900 today.

33.     Throughout its history and growth, Cannon continued to extend its presence beyond its roots in western New York to new markets and projects across the country and around the world.

**Cannon's Historic Relationship With the VA**

34.     By any objective measure, Cannon is one of the VA's most valuable architecture and engineering partners.  Cannon and the VA have worked together for more than 25 years.

35.     Cannon's relationship with the VA is its longest-existing relationship with any single client.  The VA is the only client that Cannon can say it has served from every domestic office of the Firm.

36.     The predominant practice area in which Cannon performs work for the VA is healthcare.  To that end, and to maintain the level of quality, consistency, and value that the VA requires and demands, Cannon has organized its healthcare practice to include a leadership team dedicated to its service of the VA.  This team is focused on understanding the VA on a national level but with tailored, local service, and has the capacity to respond and deploy the best resources from any of Cannon's offices around the world.  This leadership team is continually examining itself to make certain it is fulfilling the VA's needs – it meets at least every two

months to discuss Cannon's VA relationship and active projects to ensure that Cannon is dedicating the best resources to each engagement.

37.     As a demonstration of Cannon's exemplary work for the VA, Cannon was awarded various National Indefinite Delivery Indefinite Quantity Architect/Engineer ("IDIQAE") contracts.  These contracts signify that Cannon is a preferred VA provider.  Cannon has earned these IDIQAE contracts across the nation, and is now well into its second decade of being awarded such contracts.

38.     The VA has entrusted Cannon with designing some of the largest VA facilities in the country, including major projects in Cleveland, New York, and Fayetteville.

**The Event's On Which The Suspension Is Premised**

39.     The VA's suspension of Cannon on May 19, 2015 came as a shock to the company.  The stated basis for the suspension was a federal indictment of former Cannon employee, Mark Farmer (who the VA erroneously assumed was still employed by Cannon), handed down seven months earlier, on October 9, 2014.  In his indictment, Mr. Farmer was charged with multiple counts of mail and wire fraud, embezzlement and theft, violation of the Hobbs Act, and conspiracy.  Because the conduct giving rise to the indictment occurred in connection with Mr. Farmer's performance of his job for Cannon, the VA imputed his actions to Cannon.  According to the Notice of Suspension, "Mr. Farmer's alleged conduct is implicitly against the Government's interest and suspension is necessary to protect the Government's interest."  *See* Attach. 1 (Notice).

40.     The indictment of Mr. Farmer stemmed from his involvement and dealings with a former long-time VA official, William Montague.  Cannon retained Mr. Montague as a consultant in 2011.  Prior to his retirement from government service in 2010, Mr. Montague was

the Director of the Cleveland VA Medical Center ("VAMC").  In February 2010, Mr. Montague retired from the VA, and began a private consulting business.  In March 2011, Mr. Montague returned to the VA – this time as the Medical Center Director of the Dayton VAMC – for a temporary assignment.  Mr. Farmer and Mr. Montague were in the process of negotiating a consulting agreement when Mr. Montague returned to the VA as the Director of the Dayton VAMC in March 2011.  The VA was aware of and approved Mr. Montague to continue his private consulting business while he worked for the VA (subject to certain ethical constraints on which he was given training by the VA).  For his part, however, Mr. Farmer did not notify Cannon's legal department that Mr. Montague had returned to government service.

41.     The gist of the indictment was that Mr. Farmer allegedly obtained certain documents from Mr. Montague containing confidential information about VA activities and projects.

42.     Mr. Montague also provided much of the information that Mr. Montague provided to Mr. Farmer to other companies, including Cannon's competitors, as part of his consulting arrangements with those other companies.

43.     On February 20, 2014, Mr. Montague pleaded guilty to 64 charges, including charges related to his interaction with Mr. Farmer.

44.     On October 9, 2014, Mr. Farmer was indicted.

45.     Seven months later, on May 19, 2015 the VA suspended Cannon based entirely on the October 2014 indictment of Mr. Farmer.  The Notice of Suspension erroneously assumed that Mr. Farmer was employed by Cannon at that time.  *See generally* Notice.

46.     Mr. Farmer was no longer employed at Cannon when the VA issued its suspension – in fact, Mr. Farmer had not been employed at Cannon for almost a year prior to the suspension.

47.     The VA, including in particular representatives from the OIG, took an active role in the criminal investigation of Mr. Montague and Mr. Farmer, and participated in the indictment and subsequent prosecution of Mr. Farmer.   VA OIG representatives attended meetings and interviews, and even issued statements to the press when Mr. Farmer's indictment was made public.

48.     VA OIG representatives were aware, from their attendance at meetings and from the VA OIG's participation in the criminal investigations of Mr. Montague and Mr. Farmer, that Mr. Farmer was no longer employed at Cannon at the time the VA suspended Cannon.

49.     On August 19, 2015, Mr. Farmer was convicted of multiple counts of mail and wire fraud, theft of government property or records, violation of the Hobbs Act, and conspiracy.

**Taxpayer Funds Awarded to Cannon Between Mr. Farmer's Indictment and Cannon's Suspension**

50.     Notwithstanding its participation in and knowledge of the investigation and indictment of Mr. Farmer, between the indictment of Mr. Farmer on October 9, 2014 and the VA's suspension of Cannon on May 19, 2015, the VA continued to award taxpayer funds to Cannon, totaling approximately $3 million.

51.     As apparent evidence of Mr. Farmer's continued employment at Cannon, the Notice of Suspension included a document printed from the Internet on January 21, 2015 (nearly 4 months before the May 19 Notice of Suspension), purporting to show that Mr. Farmer was still employed by Cannon.   *See* Attach. 2 (Notice of Suspension Administrative Record) at 0033.

**Cannon's Response To Allegations Of Mr. Farmer's Criminal Conduct**

52.     Prior to the Montague-Farmer criminal investigation, Cannon had an unblemished record of compliance with the VA and all of its customers.  This episode shook the company to its core, and forced Cannon to take stock of every aspect of its government contracting compliance program.

53.     Even before Mr. Farmer was indicted, Cannon had learned of his possible criminal conduct and took prompt action.  Cannon first learned of the Montague-Farmer conduct in July 2013, when it received a subpoena related to the criminal investigation.  Cannon responded by, among other things, revising its Risk Management and Contracting Policy (in August 2013) and training its senior management on that revamped policy.  The company's board of directors formally adopted that policy in November 2013.

54.     Soon after it became known to Cannon in the course of the investigation, in particular during September 2013, that Mr. Farmer might have been involved in illegal conduct, Cannon suspended him, on or around October 10, 2013.

55.     Cannon also launched a search for a new compliance director, and by April 2014 had hired Paul Moskal, a 30-year veteran of the Federal Bureau of Investigation ("FBI"), as its Director of Compliance.  Mr. Moskal had served as a Special Agent in the New York, San Francisco, and Cleveland offices of the FBI, among other places, and ultimately as a Supervisory Special Agent and Chief Division Counsel in charge of legal, media and asset seizure and forfeiture programs.  In that latter role, he directed the ethics and compliance programs in the Buffalo field office.  Mr. Moskal is also an attorney licensed to practice in New York.

56.     On or about June 24, 2014, after avoiding repeated requests that he submit to an interview, Cannon gave Mr. Farmer an ultimatum to either comply or face termination.  Mr.

Farmer then resigned under pressure when Cannon refused to agree that what Mr. Farmer told Cannon's investigating lawyers would not be shared with the government.

57.     During the investigations into Mr. Montague and Mr. Farmer, Cannon cooperated with the government, and, at the government's request, provided documents and witnesses to support the government's investigation.

58.     Mr. Moskal, meanwhile, set about immediately revamping Cannon's compliance program.

59.     Prior to the VA's suspension of Cannon on May 19, 2015, Cannon had, under Mr. Moskal's leadership, implemented the following policies and procedures, among others:

    a.     All Cannon employees are required to receive training related to the possible engagement of current or former government employees or consultants, as well as training about the rules and regulations that limit contact with and receipt of information from current and former government employees.

    b.     Cannon established a Compliance and Ethics Hotline for people within or outside the firm to call to report compliance, policy, ethical, or legal issues. This hotline allows anonymous complaints and tracks progress on resolution of each complaint. Cannon employees are informed about the hotline and how to use it. Not only is the Hotline available to all employees, but all of Cannon's clients and sub-contractors, as well as the general public, can provide instantaneous anonymous reports of perceived violations of law, policy, or ethics. External parties may submit reports or concerns using Cannon's website or hotline. This program is considered so vital that it is incorporated into all of Cannon's contracts to inform its customers about how seriously Cannon takes its ethics and compliance obligations.

    c.     Mr. Moskal (in addition to others, including in-house counsel) personally reviews many of the contracts Cannon is considering to make sure the engagements will not run afoul of Cannon's policies, or relevant laws and regulations. And prior to partnering with potential domestic or international clients, partners, subcontractors, Joint Ventures, and consultants, Cannon has access to comprehensive due diligence resources.

    d.     All Cannon employees have been trained that compliance is a responsibility of each of them, and the Firm's leaders are required to ensure Cannon meets its compliance obligations. Cannon also made a number of personnel changes as a result of the investigation, including demoting a former president. Three

leadership team members and several other employees were removed from federal contracting responsibilities.

e.    As the Director of Compliance, Mr. Moskal is a member of the Board of Directors and has complete access to Cannon's Board of Directors.  He makes periodic reports on compliance, conducts training for the Board, and has the discretion to report to the Board on compliance matters at any time.

f.    Eight employees serve on Cannon's "Risk Management, Ethics, and Compliance Board," referred to internally as Cannon's "Ethics Committee."  Each member was selected, among other reasons, for his or her unblemished ethical record, lack of involvement in the Montague matter, and record of leadership at Cannon.  This Ethics Committee works to ensure that Cannon stays abreast of compliance issues and trends, and implements the various provisions of Cannon's compliance policies.  The Ethics Committee includes senior management from across the Firm, across various functional areas.  The Ethics Committee meets at least biannually to discuss and review the state of Cannon's compliance program.

g.    Cannon's Board of Directors is responsible for the review and oversight of Cannon's compliance program.  The Board meets at least biannually to discuss the state of the compliance program, and must adopt a formal resolution, signed by each board member, concurring that Cannon is satisfying its compliance obligations.

h.    Under Cannon's revamped compliance program, officers are specifically expected to monitor and oversee activities within their areas of authority and must annually certify that to the best of their knowledge their applicable business unit is compliant with all obligations of the Corporate Compliance Policy, including all applicable governmental procurement regulations and requirements.

i.    To help ensure Cannon's compliance message spreads throughout the Firm, Cannon has identified individuals to serve as Vision/Integrity Champions within each office of Cannon.  Each Vision/Integrity Champion is an officer of the firm within his/her respective office.  Vision/Integrity Champions are responsible for facilitating local implementation of, and adherence to, Cannon policies and procedures, and the requirements of the Corporate Compliance Policy.  The Director of Compliance meets with the Vision/Integrity Champions on a regular basis, to ensure all of Cannon's offices and units abide by Cannon's integrity standards.

j.    Mr. Moskal began drafting a revised Code of Conduct shortly after joining the Firm in late April 2014.  The final content of the Code of Conduct was complete and presented to the Board of Directors on April 23, 2015.  The Board adopted the Code of Conduct on May 29, 2015.  The new Code of Conduct is comprehensive and incorporates specific parameters, guidelines and practical considerations for all Cannon employees, including specific guidance to those who may deal with federal government contracting.

k.  Cannon now provides extensive training to its employees. Every Cannon employee has received training sessions which have incorporated both general and specific areas of concern depending on their role and function at Cannon. The training is continuous, personal, electronic, and interactive.

l.  Cannon retained well-recognized government contracts attorneys to train Cannon's employees on the various provisions of the compliance policy, the Federal Acquisition Regulation ("FAR"), federal procurement, interaction with government employees, and post-employment restrictions for federal employees. Employees are also trained about the Foreign Corrupt Practices Act ("FCPA"). All of the training was videotaped and new employees must, as a condition of their employment, complete the video training through a new Cannon intranet site. Each employee is required to pre-register for the series of courses creating an electronic record as well as manually sign attendance sheets acknowledging that they have completed the training. To date, these training sessions have generated approximately 5,100 hours of classroom training.

m.  Cannon also provides its employees opportunities for additional training through its intranet. In order to make available trainings convenient for the employees, and to allow Cannon to cover a wide range of topics, Cannon maintains a training library, available to employees on Cannon's intranet site. Over the last 6 months, several courses and vignettes have been constructed and rolled out, including programs such as: anti-bribery, leading with integrity, conflicts of interests, gifts, and the FCPA.

n.  Cannon has also adopted and maintained a series of robust policies and procedures, to complement its comprehensive Code of Conduct and Corporate Compliance Policy. Specifically, the Code of Conduct Supplement covers important issues and policies related to federal contracting such as: integrity, certifications and representations, off-limits information, gifts, gratuities and kickbacks, employment discussions with government personnel, organizational conflicts of interest (OCI), the Truth in Negotiations Act, time-keeping, pricing, mandatory disclosures, change orders, wage requirements, and government-furnished property. Employees are also provided with specific training on these issues.

o.  Cannon now conducts routine audits to ensure compliance with governing law. For example, Cannon conducts FCPA compliance audits, and the legal department routinely audits contracts emanating from the 27 middle-eastern countries participating in the Arab League to ensure the contracts are in compliance with US law, and to report to the proper United States authorities any language that may even appear to violate US law.

60.     Since July 2014, Cannon has incurred over $1.6 million in costs associated with its compliance efforts, including but not limited to training, the cost of salaries for individuals with compliance obligations, and costs associated with third party vendors.

61.     Among other things, the policies and revamped company culture of compliance that Cannon has implemented under the compliance leadership of Mr. Moskal will assure that Cannon will never again engage a current government employee as a consultant.   Moreover, Cannon now has specific policies in place to address employment discussions with government employees, as well as the appropriate handling of government documents.

62.     Cannon's governance structure is designed to enforce its policies and expectations throughout the business.   Cannon has zero tolerance for conduct that jeopardizes its business, its customers and other business partners, or its reputation and high standards of ethical conduct.

63.     All of the noted changes at Cannon were in place prior to the VA's suspension of Cannon on May 19, 2015, and the VA knew of, or reasonably should have known of, those changes prior to suspending Cannon.   VA OIG representatives were informed of the changes to Cannon's compliance program and kept abreast of Cannon's compliance reforms in meetings during the investigation of Mr. Farmer.

**The May 19, 2015 Suspension, Cannon's Response, and Subsequent Events**

64.     The VA suspended Cannon from all federal contracts and non-procurement awards on May 19, 2015, nearly seven months after Mr. Farmer was indicted, nearly one year after Mr. Farmer's employment with Cannon terminated, and despite having continued to award Cannon taxpayer funds.   Between Mr. Farmer's indictment and the suspension, the VA awarded Cannon approximately $3 million of taxpayer funds.

65.     The Notice of Suspension refers to Mr. Farmer as though he were currently employed by Cannon, calling him "an Associate Principal of Cannon Design, Inc." and stating that "according to publicly available information Mr. Farmer has been an Associate Principal of Cannon since as early as 2007."  Of course, it was not true as of May 19, 2015 that Mr. Farmer was still employed by Cannon.  As of that date, he had not been employed by Cannon for nearly one year.

66.     Cannon responded to the Notice promptly, in writing on June 1, 2015, documenting the many changes Cannon had already implemented (as described above in paragraphs 58 - 63) and pointing out that Mr. Farmer had long since been separated from the firm.  Cannon's written response included two submissions, totaling nearly 40 pages.  Cannon's submission also included over 35 exhibits, totaling approximately 400 pages.

67.     On June 3, 2015, Cannon made an oral presentation to the VA D&S Committee by telephone.  Through counsel, Cannon requested an in-person meeting with the D&S Committee but, at the D&S Committee's counter-request, the hearing was conducted by telephone because members of that committee are located in different geographic areas.

68.     Through Cannon's June 1, 2015 written submissions and June 3, 2015, oral presentation, Cannon demonstrated that it is a presently responsible contractor and that there was no immediate need to protect the government's interests that would have justified suspending Cannon.

69.     Between on or about June 4, 2015 and the present, counsel for Cannon made repeated attempts to contact the VA about the suspension.  Aside from non-substantive acknowledgments of these requests, the VA has remained silent about the ongoing suspension.

70.     Cannon cooperated with the government during the presentation of its case against Mr. Farmer by waiving privileged attorney-client communications involving Mr. Farmer and by making its former General Counsel available to testify for the government at Mr. Farmer's trial.

## The Harm Cannon Is Suffering From The Suspension

71.     The suspension has already had a devastating impact on Cannon and on its current and former employees; absent a preliminary injunction, the situation will be grave.  In 2014, 39% of Cannon's business came from federal, state, and local government contracts.   Including foreign government work, the volume of business at risk rises to 49%.  All of that business is at risk from the suspension, given that a contractor's status and good standing with the federal government is frequently determinative of whether it will be considered for awards by other governments.

72.     To date, Cannon has lost approximately $5 million in net fees directly as result of the suspension.

73.     While the prospective financial harm that Cannon fears and anticipates will be caused by the suspension is difficult to quantify with absolute precision, Cannon reasonably estimates that it is at risk of losing over $79 million in net fees if the suspension continues because Cannon's clients have indicted an unwillingness to continue to do business with a company that is suspended by the federal government

74.     As result of the suspension, Cannon also estimates it is at risk of being disqualified for approximately $60 million in net fees on potential contracts that Cannon has pursued.  Similarly, Cannon has lost approximately $3 million in net fees for work from existing clients, where, based on representations from the client, Cannon expects to have received

additional work but was advised by the client that because Cannon is suspended, Cannon is unable to continue to pursue the additional work.  For example, the Washington, D.C. VA Medical Center recently issued an RFP for the review of the facility's plumbing systems for legionella mitigation and compliance with VA Directive 1061.  Cannon was selected for the project after a highly competitive process and was in the final stages of negotiating scope and fees – estimated at approximately $600,000 for the project.  However, because Cannon is suspended, it can no longer receive this contract.  Not only is the loss of this specific contract harmful, but it is anticipated that every VA facility will need to review their systems for compliance with the directive and address any corrective actions that may result from the system review.  The suspension not only cost Cannon this project, but compromises Cannon's chances on future similar work as well.

75.     Indeed, the suspension puts Cannon's ability to continue work on existing IDIQ contracts, and to obtain future IDIQ contracts, in jeopardy, and could result in years of lost work that Cannon would otherwise have realized.  IDIQ contracts are long-term base contracts that are awarded to several contractors.  Agencies award work for specific projects by issuing task orders to contractors who hold the IDIQ.  While IDIQs do not, by themselves, obligate any funding or mandate work for a particular project, once Cannon obtains an IDIQ contract, it typically receives task order work using that IDIQ contract vehicle.  In order to be eligible to pursue a task order, a contractor must have already been awarded the underlying IDIQ.  IDIQ contracts are often awarded for a period of multiple years.  If Cannon is ineligible to receive the initial IDIQ contract because it is suspended, it will have lost the opportunity for any work issued under the IDIQ for years to come, even if the suspension were lifted.  Moreover, if Cannon remains suspended, it cannot receive any task orders or fees from its existing IDIQs.  Cannon currently

holds 19 IDIQ contracts from various federal agencies, under which those agencies may award up to a total of approximately $178 million in the coming years.  While Cannon would not expect to receive all of that work, if Cannon remains suspended, Cannon will be ineligible to receive the portion of the work it may have otherwise won, but for the suspension.  Cannon would also be ineligible to receive new IDIQs and would be ineligible to receive any future task orders issued under such IDIQs.

76.     The impacts go beyond Cannon's federal contracts.  Many state and local agencies, hospitals, international governments, and other public organizations, will refuse to do business with a company that is suspended by the federal government.  For example, at least one state with which Cannon does a sizeable amount of business, Massachusetts, automatically suspends a contractor that has been suspended by the federal government.  As a result of the federal suspension, Massachusetts has already suspended Cannon, resulting in nearly $7 million in potential opportunities with that state that Cannon can no longer pursue.

77.     Additionally, as a result of the suspension, Cannon has foregone pursuing approximately $24 million in potential opportunities it would otherwise have pursued, but for the suspension.  That number grows with each passing week.  Although Cannon would not expect to win all of these opportunities, this further demonstrates the potential long-term business costs of the suspension.

78.     Additionally, many commercial customers refuse to do business with a company that is suspended by the federal government, even if the work does not involve federal funds.  Cannon's government work is won by competitive pre-selection qualification processes.  The pre-selection qualification process means that Cannon is evaluated on its ability to complete a project, before the parties negotiate fees.  In most of the pre-qualification processes Cannon

participates in, whether a company is suspended by the federal government is a factor that is considered in determining whether Cannon is qualified to complete the project.  Identifying that Cannon is suspended severely limits, and in some cases likely eliminates, Cannon from consideration, even if Cannon has the technical skills required to complete the project.  Cannon also has extensive contractual requirements with its customers that require notification of any suspension.

79.     Cannon also faces an imminent and irreparable threat of additional harm to its business reputation – as more customers learn of Cannon's suspension, Cannon will continue to lose additional business, even from its commercial customers.  Even if the suspension is lifted, Cannon has already suffered substantial harm to its reputation that took almost a century to build and which could take decades to repair.

80.     And then there is the harm suffered by Cannon's employees.  Almost every employee has some investment in Cannon stock – most in retirement/pension accounts.  Cannon offers employees two retirement plans – the Cannon Corporation 401k plan and the Cannon Non-Qualified Plan for Officers.  Cannon's employees hold the majority of the company's stock in these retirement plans, and those over the age of 50 and closest to retirement hold the most significant portion.  Stock price is tied to Cannon's performance, so as Cannon continues to lose business as a result of the suspension, the retirement/pension accounts will be negatively affected.  Given the age and limited number of working years remaining for many of Cannon's older employees, it will likely be impossible for them to recover from the dramatic loss of value in their retirement savings that would occur if Cannon remains suspended.

81.     Continued suspension of Cannon will cause incredible hardship to these individuals and their families and jeopardize retirement savings that these families worked hard

to build over the decades of Cannon's otherwise exemplary corporate citizenship.  Most of these employees, it must be emphasized, had *nothing* to do with the events giving rise to criminal conduct of Mr. Montague or Mr. Farmer, yet they are now the collateral damage of the VA's suspension of Cannon.

82.     Cannon's payroll will also likely be slashed as a result of the suspension.  These are motivated, highly skilled employees – they are Cannon's most valuable asset.  If Cannon loses its top talent to competitors, Cannon's economic state will deteriorate even more rapidly.

83.     The suspension also causes harm to the communities that Cannon serves.  If the suspension is not lifted immediately, Cannon will be forced to curtail or end its extensive community service projects and contributions.  Since 2012, Cannon employees have spent nearly 12,000 hours working with their communities.  For example, in 2008, Cannon initiated its "Open Hand Studio" project, which provides world-class design and engineering services to worthy organizations, including charities benefitting children, local high school students, seniors, veterans, animals, and the environment.  Since 2012, Cannon has made over $1.7 million in corporate financial contributions to community organizations.

## COUNT I

### (The May 19, 2015 Suspension Violates the APA)

84.     Paragraphs 1 - 83 are incorporated by reference.

85.     The VA's suspension of Cannon on May 19, 2015, was final agency action, reviewable under 5 U.S.C. § 706.

86.     As of that date, because Cannon was presently responsible and did not pose an immediate threat to the interests of the United States, the VA had no lawful basis to suspend Cannon.  The May 19 suspension was arbitrary and capricious and not supported by any

reasonable basis in fact.   There was no rational connection between the facts concerning Cannon's present responsibility as of May 19, 2015, and the VA's decision to suspend it.

87.     The VA's suspension of Cannon was contrary to the FAR and its own procurement regulations, and was therefore also not in accordance with law.

88.     Furthermore, it was an abuse of discretion for Jan R. Frye, the SPE, to determine, as the SDO, to suspend Cannon.  Having the same official serve in both roles created an inherent and incurable conflict of interest that rendered Cannon's suspension arbitrary and capricious on that ground alone.

89.     It was also an abuse of discretion for the OIG to participate in the decision to suspend Cannon.  The OIG was integrally involved in the investigation of Messrs. Farmer and Montague leading up to the criminal indictment of Mr. Farmer that was the sole basis for the VA's suspension of Cannon.  Having the OIG serve on the D&S Committee created an inherent and incurable conflict of interest that rendered Cannon's suspension arbitrary and capricious on that ground alone.

## COUNT II

### (The Failure To Lift The Suspension Violates the APA)

90.     Paragraphs 1 - 89 are incorporated by reference.

91.     The VA's continuing failure to lift the May 19, 2015 suspension of Cannon is final agency action, reviewable under 5 U.S.C. § 706 as a "failure to act" on the part of the VA (5 U.S.C. § 551(13) (definition of "agency action")).

92.     Presented with overwhelming evidence that, as of May 19, 2015, Cannon was presently responsible and did not pose an immediate threat to the interests of the United States, the VA has no lawful basis to continue refusing to lift Cannon's suspension.  The VA's continued suspension of Cannon is arbitrary and capricious and not supported by any reasonable

basis in fact.  There was and remains no rational connection between the facts concerning Cannon's present responsibility as of May 19, 2015, and the VA's continuing refusal to lift Cannon's suspension.

93.     The VA's suspension of Cannon was contrary to the FAR and its own procurement regulations, and its continuing refusal to lift the suspension is therefore not in accordance with law.

94.     The VA's continuing refusal to lift the suspension also constitutes the unlawful withholding of, or the unreasonable delay in undertaking, its non-discretionary duty to lift the suspension.

95.     Furthermore, it was an abuse of discretion for Jan R. Frye, the SPE, to determine, as the SDO, to suspend Cannon.  Having the same official serve in both roles created an inherent and incurable conflict of interest that renders the VA's refusal to lift Cannon's suspension arbitrary and capricious on that ground alone.

96.     It was also an abuse of discretion for the OIG to participate in the decision to suspend Cannon.  The OIG was integrally involved in the investigation of Messrs. Farmer and Montague leading up to the criminal indictment of Mr. Farmer that was the sole basis for the VA's suspension of Cannon.  Having the OIG serve on the D&S Committee created an inherent and incurable conflict of interest that renders the VA's refusal to lift Cannon's suspension arbitrary and capricious on that ground alone.

### COUNT III

### (Declaratory Judgment)

97.     Paragraphs 1 - 96 are incorporated by reference.

98.     The Declaratory Judgment Act, 28 U.S.C. § 2201, grants this Court authority to declare Cannon's legal rights where an actual controversy exists.

99.     As stated above, an actual controversy exists between Cannon and the VA within the jurisdiction of this Court.

100.     For the reasons stated above, Cannon is entitled to a declaration that (1) the May 19, 2015 suspension was an abuse of discretion, arbitrary and capricious, or not otherwise in accordance with law; (2) the May 19, 2015 suspension is void *ab initio*; (3) the VA's continuing refusal to lift the suspension constitutes the unlawful withholding of, or an unreasonable delay in undertaking, its non-discretionary duty to lift the suspension; (4) the VA's suspension and debarring process as it has related to Cannon in connection with its suspension is fatally and incurably tainted by the conflicts of interest alleged in this Complaint; and (5) the VA may not make any contracting decisions regarding Cannon that rely on Cannon's now-voided suspension.

## PRAYER FOR RELIEF

Cannon respectfully asks that the Court:

a. Declare that:  (1) the May 19, 2015 suspension was an abuse of discretion, arbitrary and capricious, or not otherwise in accordance with law; (2) the May 19, 2015 suspension is void *ab initio*; (3) the VA's continuing refusal to lift the suspension constitutes the unlawful withholding of, or an unreasonable delay in undertaking, its non-discretionary duty to lift the suspension; (4) the VA's suspension and debarring process as it has related to Cannon in connection with its suspension is fatally and incurably tainted by the conflicts of interest alleged in this Complaint; and (5) the VA may not make any contracting decisions regarding Cannon that rely on Cannon's now-voided suspension;

b. Enjoin the VA to immediately lift and declare void *ab initio* the suspension of Cannon;

c. Enjoin the VA to immediately remove Cannon, including all Cannon entities, affiliates, and offices named in the Notice of Suspension, from the list of suspended and debarred contractors on SAM.gov;

d. Enjoin the VA from making any contracting decisions regarding Cannon that rely on Cannon's now-voided suspension;

e. Enjoin any representative of the VA OIG from participating in any consideration or decision of any kind that relates to suspension actions as to Cannon;

f. Enjoin any VA personnel with procurement responsibility from participating in any consideration or decision of any kind that relates to suspension actions as to Cannon;

g. Enjoin the VA to identify all nongovernmental organizations, contractors, or other third parties to whom the VA, including but not limited to any representatives of the VA suspension and debarment official or OIG, made any statements about Cannon's suspension status or the possibility or likelihood of future suspension or debarment, any statements regarding an OIG investigation of Cannon, or other statements about Cannon and the VA, and, with Cannon's advice and consent, to issue a statement to all such third parties correcting all misstatements made by the VA regarding Cannon.

h. Issue preliminary and permanent injunctive relief against enforcement of the VA's suspension of Cannon;

i. Award Cannon its reasonable attorneys' fees and costs expended herein; and,

j. Grant such additional relief as this Court deems just and proper.

August 31, 2015                           Respectfully submitted,

_____
Daniel W. Wolff (DC Bar No. 486733)
    dwolff@crowell.com
Angela Styles (DC Bar No. 448397)
    astyles@crowell.com (Pro Hac Vice
    Pending)
Margaret Nielsen (DC Bar No. 1014606)
    mnielsen@crowell.com (Pro Hac Vice
    Pending)
Robert Sneckenberg (DC Bar No. 1015660)
    rsneckenberg@crowell.com (Pro Hac Vice
    Pending)

CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
(202) 624-2500 (phone)
(202) 628-5116 (fax)

*Attorneys for Plaintiffs*